No. 7:20-cv-00715

---

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

---

JOHN C. MORGAN, JR. and JOHN CARTER MORGAN, JR., PLLC,

*Appellants,*

v.

JOHN P. FITZGERALD, III,
Acting United States Trustee for Region Four,

*Appellee.*

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

---

**PRINCIPAL BRIEF OF APPELLANTS**
**JOHN C. MORGAN, JR. and JOHN CARTER MORGAN, JR., PLLC**

---

Monica T. Monday (VSB No. 33461)
David R. Berry (VSB No. 90554)
GENTRY LOCKE
10 Franklin Road, SE, Suite 900
Roanoke, Virginia  24011
Tel: (540) 983-8300
Fax: (540) 983-9400
Monday@gentrylocke.com
Berry@gentrylocke.com

*Counsel for Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012(a), the appellants, John C. Morgan, Jr. and John Carter Morgan, Jr., state as follows:

- John Carter Morgan, Jr. is not a corporation;

- John Carter Morgan, Jr., PLLC, does not have a parent corporation and its stock is not publicly traded; and

- The debtor, Jessica Dawn Scott ("Ms. Scott"), is not a corporation.

# TABLE OF CONTENTS

Corporate Disclosure Statement .................................................................i

Table of Contents ................................................................................. ii

Table of Authorities ............................................................................iv

Jurisdictional Statement ........................................................................1

Issues Presented & Standards of Review....................................................2

Statement of the Case...........................................................................4

I.    Factual Overview ..........................................................................4

      a.  UpRight recruits Morgan .........................................................4

      b.  The UpRight intake process........................................................5

      c.  UpRight develops the "New Car Custody Program" .................................8

      d.  UpRight refers Ms. Scott to Morgan .........................................10

      e.  Morgan files Ms. Scott's bankruptcy petition ...........................12

II.   Procedural History........................................................................14

      a.  The September 2017 trial and February 2018 Order................................15

      b.  The first District Court appeal ................................................16

      c.  The Fourth Circuit dismissal ................................................17

      d.  The Bankruptcy Court entered final judgment on remand.......................18

Summary of Argument ........................................................................18

Argument...........................................................................................19

I.   The Bankruptcy Court improperly attributed UpRight's misconduct
     to Morgan ...................................................................................20

     a.  Morgan made reasonable efforts to ensure UpRight adhered to the
         Virginia Rules of Professional Conduct ......................................20

     b.  Morgan did not have direct supervisory authority over anyone
         who engaged in misconduct.........................................................22

     c.  Morgan did not ratify the NCCP or know it was a scam at a time
         when the consequences could have been mitigated ....................22

II.  Morgan did not abdicate his representation of Ms. Scott ................25

III. Morgan properly asserted the attorney-client privilege on behalf
     of his client..................................................................................25

IV.  The Bankruptcy Court imposed a greater sanction than necessary to deter
     future misconduct.........................................................................27

     a.  The Bankruptcy Court failed to consider the necessity of
         Morgan's revocation ...................................................................28

     b.  The Bankruptcy Court failed to consider lesser sanctions ........29

     c.  The Bankruptcy Court failed to tailor an appropriate sanction ................30

Conclusion ............................................................................................31

Certificate of Compliance .....................................................................33

Certificate of Service ............................................................................34

# TABLE OF AUTHORITIES

## Cases

*Byrd v. Hopson*, 108 F. App'x 749 (4th Cir. 2004) (unpublished) ..............19, 20

*Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991) ....................................................19

*Ex parte Burr*, 22 U.S. (9 Wheat.) 529 (1824) ............................................20, 31

*In re Echeles*, 430 F.2d 347 (7th Cir. 1970) ......................................................27

*In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*,
401 F.3d 247 (4th Cir. 2005) ................................................................................26

*In re Jemsek Clinic*, 850 F.3d 150 (4th Cir. 2017) ...............................................2

*In re Kunstler,* 914 F.2d 505 (4th Cir. 1990)................................................27, 28

*In re Parker*, 2014 U.S. Dist. LEXIS 136355
(E.D. Va. Sept. 26, 2014).......................................................................................30

*In re T.H.,* 529 B.R. 112 (Bankr. E.D. Va. 2015)...............................................30

*In re Tran,* 2014 Bankr. LEXIS 4407
(Bankr. E.D. Va. Oct. 17, 2014) ...........................................................................30

*Jason Royce Allen, et al. v. Fitzgerald*,
7:18-cv-00134-MFU (W.D. Va.)............................................................4, 16, 17

*KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398 (2007) ...........................................24

*Morgan v. Fitzgerald,* USCA4 Appeal 20-1041 ................................................17

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering*,
86 F.3d 464 (5th Cir. 1996) ..................................................................................28

*Quiel v. United States*, 2017 U.S. Dist. LEXIS 176543
(D. Ariz. Oct. 24, 2017).........................................................................................24

*Rhone-Poulenc Rorer v. Home Indem. Co.,* 32 F.3d 851 (3d Cir. 1994) ...........26

*Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) .......................................19

*Roberts v. Virginia State Bar*, 296 Va. 105 (2018) ...............................................2

*Rusnack v. Cardinal Bank*, 695 F. App'x 704 (4th Cir. 2017) ........................2, 3

*Sky Angel U.S., LLC v. Discovery Communs., LLC,*
885 F.3d 271 (4th Cir. 2018) ...............................................................................3

*United States v. Edgar,* 82 F.3d 499 (1st Cir. 1996) ..........................................26

*United States v. Shaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993) ..............2, 3, 28

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) .......................2

## Statutes

11 U.S.C. § 105 ...................................................................................................14

28 U.S.C. § 157 .....................................................................................................1

28 U.S.C. § 158 .....................................................................................................1

11 U.S.C. § 329 ...................................................................................................14

11 U.S.C. § 526 ...................................................................................................14

28 U.S.C. § 1334 ...................................................................................................1

## Rules

Fed. R. Bankr. P. 8012 ..........................................................................................i

Fed. R. Bankr. P. 8015 ........................................................................................33

Virginia Rules of Professional Conduct 5.1 ...............................20, 21, 22, 24, 25

Virginia Rules of Professional Conduct 5.3 ...................................20, 22, 23, 25

## JURISDICTIONAL STATEMENT

John C. Morgan, Jr. and John Carter Morgan, Jr., PLLC (collectively, "Morgan"), appeal a judgment of sanctions awarded by the United States Bankruptcy Court for the Western District of Virginia ("Bankruptcy Court"). The Bankruptcy Court entered the order awarding those sanctions on February 12, 2018 and, after an intervening appeal and remand by this Court, the Bankruptcy Court entered its final order incorporating the earlier judgment on November 13, 2020.

The Bankruptcy Court had jurisdiction and authority over the underlying adversary proceeding, which was initiated by the United States Trustee ("UST"), in accordance with 28 U.S.C. §§ 157(a)-(b) and 1334(a). This Court, in turn, has jurisdiction over Morgan's appeal pursuant to 28 U.S.C. § 158(a)(1).

Morgan timely filed a notice of appeal of the Bankruptcy Court's final order on November 25, 2020. With the consent and agreement of the UST, Morgan moved for an extension of the parties' appellate briefing schedule. Dkt. No. 6. On February 19, 2021, the Court granted Morgan's motion and entered an order extending the deadline to file his Principal Brief ("Brief") by 60 days to April 11, 2021. *See* Dkt. No. 7. Morgan, having retained new counsel, now files this Brief on the next business day, April 12, 2021.

1

<u>**ISSUES PRESENTED & STANDARDS OF REVIEW**</u>

**<u>Issue 1</u>:** Whether the Bankruptcy Court erred by sanctioning Morgan – both monetarily and by revoking his privilege to practice before it for 18 months – after he effectively represented his client, Ms. Scott, and successfully obtained a discharge on her behalf in the underlying bankruptcy case.

This Court reviews the Bankruptcy Court's decision to impose sanctions for an abuse of discretion. *See In re Jemsek Clinic*, 850 F.3d 150, 156 (4th Cir. 2017) ("A court abuses its discretion when its conclusion is 'guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'") (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)). In conducting this inquiry, the Court reviews legal conclusions de novo and factual findings for clear error. *See, e.g., Rusnack v. Cardinal Bank*, 695 F. App'x 704, 708 (4th Cir. 2017).

**<u>Issue 2</u>:** Whether the Bankruptcy Court erred by attributing the misconduct of a nationwide law firm to Morgan, and concluding he violated the Virginia Rules of Professional Conduct, despite uncontradicted evidence that Morgan was a "limited partner," with no managerial authority, and had no knowledge of any misconduct by the firm.

The Bankruptcy Court's factual findings are reviewed for clear error, *id*., but its interpretation of the Virginia Rules of Professional Conduct is subject to de novo review. *See Roberts v. Virginia State Bar*, 296 Va. 105, 115 (2018); *see also United*

*States v. Shaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993) (reviewing district court's interpretation and application of state disciplinary rules de novo).

**Issue 3:** Whether the Bankruptcy Court erred by finding Morgan engaged in misconduct when he permitted his paralegal to obtain Ms. Scott's signature and then filed her bankruptcy petition without first meeting her in person.

The Bankruptcy Court's legal conclusions are reviewed de novo, and its factual findings are reviewed under the clearly erroneous standard. *See Rusnack*, 695 F. App'x at 708.

**Issue 4:** Whether the Bankruptcy Court erred by finding that Morgan improperly asserted the attorney-client privilege on behalf of Ms. Scott.

Appellate courts review "legal conclusions regarding the attorney-client privilege de novo and [] factual findings under the clearly erroneous standard." *Sky Angel U.S., LLC v. Discovery Communs., LLC*, 885 F.3d 271, 276 (4th Cir. 2018).

## STATEMENT OF THE CASE

This is Morgan's second appeal.[1] Because the first appeal resulted in remand, the Court has not yet entered a final order and Morgan has not had an opportunity to appeal to the Fourth Circuit. Accordingly, in this new appeal, Morgan amplifies his prior arguments and renews his request that the Court reverse or reduce the sanctions entered against him. The Court is not bound by its prior rulings.

### I.   Factual Overview

Morgan is a member of the bar of the United States Bankruptcy Court for the Western District of Virginia.[2] R1896.[3] He obtained electronic filing privileges in 2005. R1897. Since that time, Morgan has engaged in consumer bankruptcy cases within the Western District. R78, 1896.

### a.   *UpRight recruits Morgan*

In early-2014, Morgan was approached by Kevin Chern, the managing partner of UpRight Law, LLC ("UpRight"),[4] who indicated he was "starting a national law

---

[1] Morgan continues to rely on the arguments presented in his first appeal and, as before, contends the Bankruptcy Court abused its discretion by revoking his privilege to practice for 18 months. *See Jason Royce Allen, et al. v. Fitzgerald*, 7:18-cv-00134-MFU (W.D. Va.), ECF Nos. 111 and 121.

[2] The Virginia State Bar has disciplined Morgan twice. In 1992, he was issued a public reprimand for contacting the represented client of another attorney in a criminal matter. In 2001, while struggling with substance abuse, Morgan's license was suspended for three years after he was convicted of a felony possession and attempted possession of cocaine. R00078 (taking judicial notice of 2001 suspension order); http://www.vsb.org/disciplinary_orders/morgan_opinion.html.

[3] This Brief cites to the Appendix of Record, "R__," as indicated in the Table of Contents.

[4] UpRight also does business as Law Solutions Chicago, LLC, which, in turn, operates under various other assumed names. R00067. For purposes of this Brief, "UpRight" refers to all of them collectively.

firm" and looking for local "limited partners." R1814 (19:20-20:17). The idea was to "match up, on a multi-jurisdictional basis, attorneys who were looking for work with consumers who needed bankruptcy assistance." R69. Chern explained that UpRight would help the limited partners find bankruptcy clients "via the internet." R1814 (20:4-17). The limited partners would then "meet with the client over the phone and the computer and gather information for preparation of a bankruptcy [petition]," as well as "attend the 341 meeting and close the[] case." *Id*.

Morgan joined UpRight as a "limited partner" in January 2014. R1913-51. Morgan's partnership agreement stated that he "shall not, under any circumstances, be deemed to own any interest or have any voting rights within [UpRight]." R1946. The partnership agreement further stated that "management and governance of the Firm is vested in the Managers and owners of the Firm," and Morgan had "no right to participate in the management of the Firm." R1946-47. Like other limited partners, however, Morgan was responsible for maintaining his own local office. R1935. UpRight, in turn, routed clients to him from its office in Chicago. R1934.

### b. *The UpRight intake process*

UpRight's Chicago office was staffed with in-house attorneys as well as "client consultants." R931-32 (88:10-89:11), R984 (141:5-142:11). The client consultants screened calls and online inquiries from prospective clients interested in filing for bankruptcy. R931 (88:14-89:11). They first gathered basic information

from potential clients, such as their ability to pay for legal services, and gauged their interest in filing for bankruptcy. *Id*. If the potential client met UpRight's criteria, he or she would be transferred to a "senior" client consultant who then identified the potential client's goals, desires, and motivation for pursuing bankruptcy.[5] *Id*.

UpRight instructed its client consultants that they could not provide legal advice. R797 (304:3-18), 984 (141:5-14), 1012 (169:2-22). Morgan likewise testified that, at the outset, he "had a conversation with [his] partners" and was "assured" those partners would supervise the staff in Chicago. R508 (15:11-16). He was also provided documentation to that effect, R799 (306:2-15), 1517-19 (15:3-17:22), 1952-54, 1955-77, 1998-2040, and he trusted his partners to supervise the staff for him. R502-03 (9:16-10:3).

Morgan did not communicate with potential clients until *after* they were referred to him by the Chicago office. R533 (40:9-16). Chicago is where the client consultants would first set up a payment plan "and have the client verbally agree to begin representation." R1952. If the client agreed, he or she would be transferred to one of UpRight's in-house "onboarding attorney[s]," who "review[ed] the file for procedural, legal and ethical compliance." *Id*. The in-house attorney then sent the client a "written retainer memorializing the terms of the verbal agreement," which

---

[5] Senior client consultants were paid a salary plus commission, based, in part, on how many clients they signed. R71.

clarified that the "firm does not represent you until you talk to [a] local attorney and they accept you as a client."[6] R72-73. At that point, UpRight emailed the local partner, in this case Morgan, and directed him to contact the client, review the terms of representation, and, if he approved, confirm the representation. R984 (141:5-142:11), 1033-06 (190:13-193:8), 1952.

UpRight and its local partners typically did not collect documents from the client or prepare a draft petition until the client paid, in full, for legal services. R1033-06 (190:13-193:8). But the post-payment process changed over time. *Id*. Before September 2015, a team in Chicago collected documents from the client and an in-house attorney prepared a draft bankruptcy petition. *Id*. After September 2015, UpRight shifted these responsibilities to its local partners, who now handle document collection and petition drafting. *Id*. At all times, however, UpRight prepared the Rule 2016 disclosures for its local partners from its office in Chicago.[7] R1040 (197:20-25).

After collecting documents and preparing the draft petition, UpRight's local partners were responsible for reviewing the petition, verifying it with the client,

---

[6] Consistent with this practice, Ms. Scott was presented with an "Attorney Client Base Retainer Agreement for Chapter 7 Bankruptcy Related Services." R2061-66. The agreement included Morgan's electronic signature, R2066, but specifically stated: "The undersigned Partner of Firm has authorized Firm to affix Partner's digital signature upon this Agreement. Agreement is subject to Partner's further review and approval after consultation with you." R2061.

[7] These procedures, both before and after September 2015, were reviewed and approved by UpRight's outside ethics counsel. R1955-97, 1998-2040.

making corrections, and filing the petition as well as attending the meeting of creditors. R1033-36 (190:13-193:8), 1820 (42:2-25), 1935-37, 1952-54.

### c.  *UpRight develops the "New Car Custody Program"*

In May 2015, UpRight launched the "New Car Custody Program" ("NCCP") in partnership with a towing company, Sperro LLC ("Sperro"). R816-17 (323:22-324:7). Chern announced the NCCP to UpRight's 137 local partners in an email dated June 18, 2015. R2041-43. Chern's email explained that UpRight recently started "offering a new program . . . that allows a client to surrender a vehicle to a towing and storage facility and have the cost of their bankruptcy case fully subsidized." R2041. Chern identified four "qualifications" for the client to participate: (1) "[c]lient wants to file for Chapter 7 bankruptcy," (2) "[c]lient has a vehicle, boat, truck, or other property that the client is willing to surrender," (3) "[t]he property intended to be surrendered has no equity," and (4) "[t]he property to be surrendered is worth greater than $5000." *Id*.

Chern also described how the NCCP worked. *Id*. He explained that the client first contacts Sperro, "a towing and storage company," and arranges for it to take custody of the client's vehicle. *Id*. Then, at the time of surrender, the client signs a "towing, storage, and custody agreement with Sperro whereby the client contracts with Sperro to load the vehicle, tow it to a facility, store it and maintain it until such time as the finance company picks up the vehicle." *Id*. According to Chern, "Sperro

charge[d] customary and reasonable fees for these services (e.g., $75 loading fee, $1.50 per mile towing, $45/day storage, etc.)." *Id*.

Chern next identified several "benefits" for clients who participated in the NCCP. *Id*. He explained those clients could immediately cancel vehicle insurance, stop maintaining the vehicle, and save the expenses of "plating or storing" the vehicle. *Id*. In addition, the clients would "not have to worry about the repo man showing up at [] home or work" and they could direct their creditors "to Sperro instead of fielding calls related to the recovery of the vehicle." *Id*. Chern also advised that, "[i]mmediately upon placing the vehicle in Sperro's custody, Sperro will remit the entire legal fee plus filing fee to UpRight Law on client's behalf."[8] *Id*.

Finally, Chern described the "Due Dilligence" he and others had done in connection with the NCCP. *Id*. He explained that he "reviewed the program in detail with Felicia Burda, our UST Counsel, Mary Robinson, o[u]r Professional Responsibility Counsel and David Leibowitz, General Counsel of UpRight Law and Head of Litigation." *Id*. UpRight also "[p]erformed background check on ownership of Sperro," "[r]olled out program on a limited basis to test reaction of panel trustees, the UST and creditor/creditor counsel," and "properly disclosed [Sperro] on the bankruptcy petition SOFA as the source of payment of client's legal fees." *Id*.

---

[8] Morgan understood that, depending on the circumstances, Sperro would not necessarily subsidize all bankruptcy fees and costs. Specifically, as it relates to Ms. Scott, Morgan was under the impression she paid $100 per week. R1202 (48:4-16).

Chern concluded his email by assuring Morgan and UpRight's other local partners that the NCCP was "ethical" and "legally compliant": "We feel that this program is ethical, legally compliant and affords debtors the ability to relieve themselves of the custody of a vehicle they do not want and have their legal fees subsidized."[9] R2042.

Chern's June 18 email was the only information Morgan received from UpRight about the NCCP before he filed the bankruptcy petition giving rise to this case. R1201 (47:22-48:20), 1830 (82:5-18). Morgan did not participate in the development or vetting of the program, R1201 (47:1-4), and he never advised any clients to participate in the program. R1201 (47:5-13).

### d. *UpRight refers Ms. Scott to Morgan*

Ms. Scott found UpRight through an internet search. R90, 1870 (25:14-18). She then contacted UpRight and, on October 15, 2015, spoke with Brandon Fox ("Fox") – a senior client consultant. R2050 (12:13-13:3). Fox asked if Ms. Scott

---

[9] One local attorney questioned the NCCP as described by Chern in the June 18 email. R2044-46. Chern responded: "[t]hey hold the car in one of three states that allow for mechanic's liens that trump the 1st lien. 60% of the time, they pick up the car and satisfy the charges. 40% of the time they just abandon the vehicle. Sperro really makes its money when the finance company abandons and Sperro auctions it off." *Id.* The local attorney replied that "it just seems like it is cheating the unsecured creditor . . . . But you have clearly presented the scenario to people who are well positioned to give a recommendation, so I am not going to object." R2044. That local attorney also noted he was grateful he joined UpRight, which he was hesitant to do because of a prior experience with another firm that "turned into a sham run by the marketing department trying to get around the laws for debt negotiators." *Id.* At UpRight, by contrast, the "staff of attorneys and paralegals is amazing" and "[t]he level of professionalism and integrity is second to none." *Id.*

knew which Chapter of bankruptcy she wanted to file, and she said "Whichever wipes out everything." *Id*. Fox replied, "Okay. So Chapter 7 definitely." *Id*. Ms. Scott also indicated she was interested in surrendering her vehicle, and Fox told her about the NCCP. R2050 (13:2-34:5).

Ms. Scott paid an initial $100.00 payment, by telephone, on October 15, 2015. When it cleared, Fox told her: "You're represented by UpRight Law." R2051-52 (17:9-19:10).

On October 19, 2015, Ms. Scott spoke with Fox again. R2055 (30:1-31:19). She asked about a debt she co-signed with her ex-spouse, and stated she did not "want to screw him over" by filing for bankruptcy. *Id*. Fox told her that, if she wanted to keep the loan, "we can keep it off and you can continue to pay on it." *Id*. Morgan unequivocally testified that he did not and would not authorize Fox, or any other non-attorney staff, to tell debtors to keep a debt off of their bankruptcy schedules. R1853-54 (177:22-178:7). Moreover, at the time these statements were made, *Morgan had not yet approved Ms. Scott as a client or agreed to represent her. See* R1910-11, 2112-13.

On October 20, 2015, Ms. Scott executed an engagement agreement with UpRight. R2061-77. The fee agreement stated that the total fee for her bankruptcy was $1,835.00. R2067.

11

On October 24, 2015, Ms. Scott spoke with Morgan by telephone for an initial consultation. R2112-13. He then approved her as a client. *Id*. By that point, Fox had already told Ms. Scott about the NCCP and enrolled her in the program. R2052 (18:20-19:4), 2060. And, Sperro had already picked up her car. R2059, 2113, 2223.

By letter dated November 9, 2015, Sperro advised Ms. Scott's lien holder that her vehicle had been towed to Indiana, and that the "reasonable fees" associated with towing, storing, and maintaining the vehicle totaled $3,258.80. R2084-85. Sperro also advised that if the lien holder did not pay within 15 days "after your receipt of this notice," the vehicle would be sold at public auction on November 28, 2015 pursuant to its mechanic's lien under Indiana law. *Id*. Unbeknownst to Morgan, on November 17, 2015, Sperro wrote UpRight a $1,650.00 check for Ms. Scott's attorney's fees, plus a $335.00 check for the filing fee.[10] R2086-87.

## e. *Morgan files Ms. Scott's bankruptcy petition*

Morgan filed Ms. Scott's Chapter 7 petition on February 23, 2016.[11] R1911, 2169-2221. Morgan was responsible for collecting documents from Ms. Scott, as

---

[10] The checks were written by Brian Fenner, Sperro's principal, from "Fenner & Associates LLC" to UpRight. R92-92, 2086-87.

[11] Notably, on February 24, 2016, the day *after* Morgan filed Ms. Scott's petition, Chern sent Morgan an email notifying him that UpRight "came to find out Sperro [] may have delayed notifying the finance companies that they were in custody of vehicles until after having incurred substantial towing and storage fees." R2222-23. Chern also explained that "cases involving Sperro paying the legal fees and being filed by lawyers at [UpRight] are receiving an increased level of scrutiny by both attorneys for the finance company and the office of the United States Trustee resulting in UST inquiries and 2004 exams on a number of cases." *Id*.

well as drafting her petition. R1035-36 (192:19-193:8). Morgan also reviewed the petition before filing, although he did not do so with Ms. Scott. R1821-22 (48:25-52:5). Instead, Morgan's wife and paralegal reviewed the petition with Ms. Scott and witnessed her signature. *Id*. Morgan was readily available, if needed, to address any concerns, and he verified and authorized the filing of the petition by initialing his name and "OK." *See* R2120.

Morgan later learned there were errors in Ms. Scott's petition.[12] *Id*. The errors related to the Statement of Financial Affairs ("SOFA") and Rule 2016 disclosure, which had been prepared by an in-house attorney in UpRight's Chicago office.[13] R1040 (197:20-25), 2218, 2224, 2228-29. Those issues came to light during Ms. Scott's meeting of creditors, which the UST attended, on March 23, 2016. R1906-07. An associate with Morgan's firm accompanied Ms. Scott to the meeting, in place of Morgan, and with Ms. Scott's permission. R589-90 (96:22-97:24), 1906.

Following the meeting, and after discussing it with his associate, Morgan filed an amended Rule 2016 disclosure as well as an amended SOFA. R1907. The amended filings clarified that Sperro paid UpRight an attorney's fee of $1,650.00, plus the filing fee, but they did not indicate that Sperro picked up Ms. Scott's vehicle

---

[12] Among other issues identified by the Bankruptcy Court, the Rule 2016 disclosure incorrectly stated that Ms. Scott paid UpRight $1,500.00, plus $335.00 for the filing fee. R93, 2218. The Rule 2016 disclosure also did not reference Sperro, or the fact that it paid fees on behalf of Ms. Scott. R93, 2218.

[13] When Morgan later contacted UpRight about the discrepancies, he was told the "SOFA #16 and Form 2030 were completed by an attorney who is no longer with the firm." R2224.

or that she previously paid $100.00 directly to UpRight. R2230-37. The SOFA also

purported to bear Ms. Scott's electronic signature, R2236, although she did not sign

it. R1907.

Ms. Scott received a Chapter 7 discharge on July 1, 2016. R93, 1911.

## II.    Procedural History

In June 2016, the UST filed an adversary complaint in Ms. Scott's bankruptcy

case against Morgan, UpRight, Chern, Sperro, and others.[14] R1-31. The complaint

asserted five claims:

- Count I: Disgorgement under 11 U.S.C. §§ 329(a) and 105(a);

- Count II: Disgorgement under 11 U.S.C. § 329(b);

- Count III: Injunction under 11 U.S.C. § 526(c)(5)(A);

- Count IV: Civil penalties under 11 U.S.C. § 526(c)(5)(B); and

- Count V: Sanctions under 11 U.S.C. § 105 and inherent powers.

R15-18. As to Count V, the UST alleged that "[c]ause exists for the court to use its

inherent power and the authority granted to it [by statute] to prohibit Morgan" from

practicing before the Bankruptcy Court. R17-18. Morgan denied the allegations.

R32-60.

---

[14] The UST also filed a similar adversary proceeding against another UpRight local attorney, Darren Delafield, which named the same co-defendants – including UpRight and Chern, as well as Jason Allen ("Allen") and Edmund Scanlan ("Scanlan"). The cases were consolidated for purposes of discovery, trial, and the first appeal to this Court. R 63, 66, 137. The defendants in those consolidated proceedings are collectively referred to as the "UpRight Defendants."

In April 2017, the UST subpoenaed Ms. Scott and demanded she produce various documents related to her bankruptcy petition. R2238-54. Prior to the subpoena return dates, Morgan sent Ms. Scott a letter advising her that, among other things: (1) UpRight had a potential conflict of interest, which could possibly be waived, and (2) she was encouraged to discuss any conflict waiver with another attorney and UpRight could assist her in doing so. R2255-57. Ms. Scott affirmatively signed the conflict waiver. R2257.

In the interim, UpRight's in-house counsel, David Menditto ("Menditto"), drafted objections to the subpoena. R94. The objections asserted the attorney-client privilege on behalf of Ms. Scott, and they were purportedly served on the UST by Morgan. R2258-74. The Bankruptcy Court found that "Menditto apparently 'mistakenly' put Morgan's name on the subpoena objection." R94. Morgan, however, independently discussed the privilege with Ms. Scott, and she "adamantly said she wanted to assert her privilege." R5835 (104:11-25).

The UST did not amend its complaint to allege Morgan engaged in litigation misconduct during the adversary proceeding, nor did it request relief on that basis.

### a. *The September 2017 trial and February 2018 Order*

In September 2017, the Bankruptcy Court conducted a four-day bench trial in connection with the adversary proceedings against Morgan and the remaining UpRight Defendants. R178-1280. On February 12, 2018, the Bankruptcy Court

issued a Memorandum Opinion, outlining its factual findings and conclusions of law, along with an Order entering judgment against Morgan on Counts I, II,[15] and V. R65-126, 127-132. Specifically, in connection with Count V, the Bankruptcy Court revoked Morgan's privilege to appear before the court for a period of 18 months, and sanctioned him $5,000.00 to be paid to Ms. Scott. R114-125, 128-130. The Bankruptcy Court entered similar sanctions, to varying degrees, against the remaining UpRight Defendants.

### b. *The first District Court appeal*

The UpRight Defendants, including Morgan, appealed the Bankruptcy Court's February 2018 Order to this Court. R133-136; *see also Jason Royce Allen, et al. v. Fitzgerald*, 7:18-cv-00134-MFU (W.D. Va.), ECF No. 111 ("UpRight Defendants' Principal Brief"). The UpRight Defendants' Principal Brief exceeded 100 pages and challenged a litany of factual findings and legal conclusions made by the Bankruptcy Court. The vast majority of those arguments, however, focused on the sanctions against UpRight, Chern, Allen, and Scanlan. *See, e.g.,* UpRight Defendants' Principal Brief at 82-88.

For his part, Morgan argued the Bankruptcy Court abused its discretion by sanctioning him monetarily and revoking his privilege to practice for 18 months. *Id.*

---

[15] In connection with Counts I and II, the Court ordered Morgan and the other UpRight Defendants to "disgorge any attorney's fees received [in Ms. Scott's case]." R128. Those fees had already been refunded. R101, 1868 (16:22-18:10).

These arguments distilled into two categories: (1) Morgan had no managerial authority over UpRight and should not be sanctioned for the firm's conduct – as it related to the NCCP, unauthorized practice of law, assertions of privilege, or otherwise, and (2) Morgan's reliance on his paralegal did not warrant the sanctions imposed. *Id*.; *see also Jason Royce Allen, et al. v. Fitzgerald*, 7:18-cv-00134-MFU (W.D. Va.), ECF No. 121 at 31-36, 39-41.

On December 11, 2019, this Court issued a Memorandum Opinion and Order, which affirmed all of the sanctions entered against Morgan. R137-60, 161-62. In doing so, however, the Court partially vacated the Bankruptcy Court's February 2018 Order, and remanded the case for further proceedings regarding the ability of UpRight, Chern, and Allen to pay the monetary sanctions against them. R161.

### c. *The Fourth Circuit dismissal*

Morgan timely appealed this Court's December 2019 Order to the Fourth Circuit. *See Morgan v. Fitzgerald*, USCA4 Appeal 20-1041. Because of the remand, however, the UST moved to dismiss Morgan's appeal as premature. *Id*. at ECF No. 5. Specifically, the UST argued that the "appeal should be dismissed because the remand rendered the district court's order interlocutory so [the Fourth Circuit] is without jurisdiction to hear [Morgan's appeal]." *Id*.

The Fourth Circuit granted the UST's motion and, on April 7, 2020, dismissed Morgan's appeal. *Id*. at ECF Nos. 9 and 10. Morgan consequently had no choice but to await the Bankruptcy Court's decision on remand and then re-appeal.

### d. *The Bankruptcy Court entered final judgment on remand*

On November 11, 2020, the Bankruptcy Court entered a final order following the remand from this Court. R163-73. The remand proceedings did not affect Morgan or disturb the sanctions against him, and the Bankruptcy Court's corresponding 2020 Order does not limit his right to appeal. R172. UpRight, Chern, and Allen, by contrast, consented to modified sanctions and, in doing so, waived their right to further appeals. *Id*.

Morgan's counsel subsequently withdrew due to a "potential conflict . . . regarding Withdrawing Counsel's continuing representation of [Morgan] before this Court." Dkt. 8. Morgan retained new counsel and, with a specific focus on the sanctions against him, now pursues this appeal – as he is required to do.

### <u>SUMMARY OF ARGUMENT</u>

The Bankruptcy Court abused its discretion by revoking Morgan's privilege to practice for 18 months. That sanction improperly penalizes Morgan for the misconduct of UpRight – including misconduct that transpired *before* Ms. Scott retained Morgan to represent her. There is no evidence Morgan knew or had reason to know that UpRight, despite what it told him, was not properly supervising its non-

attorney staff in Chicago. There is also no evidence that Morgan knew or should have known the NCCP would "turn[] out to be a scam."

To be sure, Morgan had his own misgivings. He does not dispute this. But those misgivings do not warrant the sanctions imposed. For one, Morgan never abdicated his duties or delegated them to a paralegal. He remained responsible for preparing, reviewing, and filing Ms. Scott's petition, as well as advising Ms. Scott about all of the implications of pursuing bankruptcy, which he did. Morgan also amended the petition when he became aware of discrepancies in the financial documents drafted by an attorney in the Chicago office. And, when the UST subpoenaed his client, Morgan did exactly what she asked him to do: he asserted the attorney-client privilege.

Accordingly, as explained below, Morgan respectfully requests that this Court vacate or, alternatively, reduce his 18-month practice revocation.

## **ARGUMENT**

The Bankruptcy Court exercised its inherent power to sanction Morgan. "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)). This is especially true where, as here, a court invokes those powers to revoke an attorney's privilege to practice. *Byrd v. Hopson*, 108 F. App'x 749, 756 (4th Cir. 2004) ("The inherent power to disbar an

attorney must be 'exercised with great caution.'") (unpublished) (quoting *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531 (1824)).

Revoking an attorney's privilege to practice law is an "extreme sanction." *Id*. That privilege "ought not to be lightly or capriciously taken from him." *Ex parte Burr*, 22 U.S. (9 Wheat.) at 530. The Bankruptcy Court abused its discretion by doing so.

### I.   The Bankruptcy Court improperly attributed UpRight's misconduct to Morgan.

The Bankruptcy Court "laid" the NCCP "scam . . . at [Morgan's] feet," and concluded that "he, too, bears responsibility for filing a case . . . in which his client was put into the Sperro Program." *See* R119-23 ("Delafield and Morgan bear responsibility for their actions as well . . . . That it turned out to be a scam is laid equally at his feet."). This conclusion stems from a misapplication of the Virginia Rules of Professional Conduct. Specifically, the Bankruptcy Court misinterpreted and misapplied Rules 5.1 and 5.3.

### a.   *Morgan made reasonable efforts to ensure UpRight adhered to the Virginia Rules of Professional Conduct.*

Neither Rule 5.1(a) nor Rule 5.3(a) compel the conclusion that Morgan, as a limited partner, is strictly liable for UpRight's misconduct in this case. Those rules instead required Morgan to "make *reasonable* efforts to ensure that the firm has in effect measures giving *reasonable assurance*" that UpRight's lawyers and non-

lawyers adhered to the Rules of Professional Conduct. *Id.* (emphasis added). Morgan clearly met that standard under the facts of this case.

Morgan made reasonable efforts to ensure UpRight's in-house attorneys supervised its non-attorney staff in Chicago. He discussed UpRight's operations with Chern, UpRight's managing partner, directly. R1517-19 (15:3-17:22). UpRight also provided Morgan with documentation stating that its in-house attorneys supervised the non-attorney staff, *Id.*, as well as legal ethics opinions approving its practices. R1952-54, 1955-97, 1998-2040. There can be no dispute that UpRight's senior management assured Morgan that it properly supervised its non-attorney staff in Chicago. R508 (15:11-16).

The inefficacy of UpRight's purported compliance measures cannot be laid at Morgan's feet. He was a limited partner with no managerial authority. *See* Rule 5.1 cmt. 1 ("Paragraph (a) applies to lawyers who have managerial authority over the professional work of a firm."). Under the circumstances, the only reasonable thing Morgan could have done was ask Chern about UpRight's policies. It was not unreasonable for him to rely on the response. This is especially true given Morgan's understanding that UpRight's ethics counsel reviewed and approved its practices. R1952-54, 1955-97, 1998-2040.

Moreover, prior to the UST's adversary proceeding, Morgan had no reason to know that UpRight was not doing enough to ensure compliance. Morgan trusted

UpRight, and he reasonably relied on its management to implement the policies explained to him. Those policies required, among other things, active supervision of non-attorney staff and adequate training that they may not provide legal advice.

### b. *Morgan did not have direct supervisory authority over anyone who engaged in misconduct.*

Morgan did not violate Rules 5.1(b) or 5.3(b), either. Those rules only apply to lawyers "having direct supervisory authority" over another person. Morgan clearly did not have "direct" supervisory authority over UpRight's staff in Chicago. Moreover, the Bankruptcy Court did not make any findings of misconduct by the personnel in Morgan's local office. And rightly so; they did nothing wrong. Morgan's paralegal, a notary public, simply witnessed Ms. Scott sign the petition.

### c. *Morgan did not ratify the NCCP or know it was a scam at a time when the consequences could have been mitigated.*

The Bankruptcy Court's reliance on Rules 5.1(c) and 5.3(c) was also misplaced. Neither of those rules shift responsibility to Morgan for "filing a case . . . in which his client was put into the Sperro Program." R123. The rules do not apply unless a lawyer "ratifies the conduct involved" or "knows or should have known of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." *See* Rules 5.1(c) and 5.3(c); *see also* Rule 5.3 cmt. 1 ("The Committee adopted this Rule as a parallel companion to Rule 5.1 . . . [and]

inserted the phrase 'or should have known' in Rule 5.3(c)(2) to reflect a negligence standard.").

The Bankruptcy Court overlooked the fact that Ms. Scott enrolled in the NCCP, and Sperro towed her car, *before* she retained Morgan as her attorney. By that time, the damage was done. And at that time, Morgan had no idea the NCCP program was illegitimate. Nothing changed before he filed Ms. Scott's petition. UpRight waited until February 24, 2016 – the day *after* Morgan filed Ms. Scott's petition – to notify him that it had "c[o]me to find out" Sperro was a scam. R2222-23. In reality, UpRight ended the program in late-2015 without telling Morgan. *Id*.

Chern's earlier June 18 email did not put Morgan on notice that the NCCP was a scam. R2041-42. It did just the opposite. *Id*. The email lauded the NCCP as a new program that benefitted clients by subsidizing their bankruptcy cases and alleviating their maintenance costs for vehicles they no longer wanted. *Id*. Chern explained that Sperro charged "customary and reasonable fees for [its] services," and that the program had been vetted by outside ethics counsel. *Id*. Chern also concluded his email by assuring UpRight's 137 local partners that the NCCP was "ethical" and "legally compliant." R2041-43.

Only one of UpRight's hundreds of local partners questioned the NCCP in response to Chern's email. R2044-46. Yet even that partner did not "object" because, based on the email, Chern "clearly presented the scenario to people who are well

positioned to give a recommendation." *Id*. This is not to say UpRight senior management did not know the program was designed to prime secured lenders. *Id*. But that was never communicated to Morgan. R929 (86:6-15), 1201-02 (47:22-48:20), 1830 (82:6-18). Instead, UpRight assured Morgan and others that the NCCP was "ethical" and "legally compliant." R2041-42.

The Bankruptcy Court acknowledged this. It found that, from the local partners' perspective, the NCCP "turned out to be a scam." R119-24. Yet there is no evidence Morgan knew that when he filed Ms. Scott's petition. Instead, the Bankruptcy Court sanctioned Morgan because, in hindsight, it found he "bears responsibility for filing a case . . . in which his client was put into the Sperro Program." R 123. That was improper. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning."); *see also Quiel v. United States*, 2017 U.S. Dist. LEXIS 176543, at *32 (D. Ariz. Oct. 24, 2017) (noting "courts must guard against" "hindsight bias . . . when evaluating past performance with the benefit of future knowledge").

\* \* \* \*

There is no evidence Morgan approved, ratified, or acquiesced in UpRight's misconduct. As explained above, he had no reason to know UpRight's client consultants were giving legal advice or that the NCCP was a scam. Morgan should

not be sanctioned based solely on his limited association with UpRight. *See* Rules 5.1 and 5.3.

## II.     Morgan did not abdicate his representation of Ms. Scott.

Morgan acknowledges that his paralegal met with Ms. Scott, reviewed the petition with her, and witnessed her signature. But he did not delegate his representation of Ms. Scott. The evidence instead shows that, at all times, Morgan understood he was responsible for preparing Ms. Scott's petition, verifying its accuracy, filing her case, and representing her throughout the bankruptcy proceedings. R1033-36 (190:13-193:8), 1820 (42:2-25), 1935-37, 1952. Morgan did just that, and successfully secured a discharge on behalf of his client. R1911.

The fact that Morgan first "laid eyes" on Ms. Scott after her discharge changes nothing. R123-24. Nor does it support the Bankruptcy Court's finding that Morgan failed to "meet with the client, go over the petition and schedules, verify their accuracy, explain the ramifications, answer questions, and obtain the signature." R124. Indeed, Morgan did all of those things – both directly and with the assistance of his paralegal. R1821-22 (47:12-52:11). Tellingly, Ms. Scott has never voiced any concerns with the quality of her representation. *See generally* R1866-93.

## III.     Morgan properly asserted the attorney-client privilege on behalf of his client.

After Ms. Scott's bankruptcy gave way to an adversary proceeding, Morgan notified her of the potential conflict. R2255-56. She then affirmatively signed a

conflict waiver, R2257, and his representation continued. Throughout the course of that representation, Morgan properly asserted the attorney-client privilege on behalf of Ms. Scott. He was duty-bound to do so – as Ms. Scott requested.

"Because the attorney-client privilege exists for the benefit of the client, the client holds the privilege." *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005). Only the client may waive that privilege. *Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994) (explaining privilege may be waived if client takes affirmative steps to do so). It is not the attorney's privilege to waive. *United States v. Edgar*, 82 F.3d 499, 508 (1st Cir. 1996) ("A lawyer has an obligation not to reveal client confidences" and "to assert the privilege on behalf of the client.").

Ms. Scott never directed Morgan to waive her attorney-client privilege. And he was never in a legal position to waive it on her behalf. This is because Ms. Scott told Morgan to assert the privilege, both before and after he asserted it. R5834-35 (101:10-104:25).

The Bankruptcy Court nevertheless inferred that Morgan acted in his own self-interest, and contrary to Ms. Scott's interests, by asserting the attorney-client privilege on her behalf. R123. This finding makes no sense. There is no evidence that it was in Ms. Scott's interest to waive the attorney-client privilege, or that Morgan advised her contrary to her own interests. Their interests were aligned.

The attorney-client privilege issue also was not before the Bankruptcy Court. The UST could have, but failed, to amend its complaint to request relief on that basis. And it never requested discovery sanctions.

But even if the issue was before the Bankruptcy Court, the court's decision to sanction Morgan for asserting his client's privilege threatens to undermine the privilege itself. The attorney-client privilege exists for the benefit of the client, only, and an entirely new conflict of interest will arise if attorneys may be subject to an adverse inference because they advise their clients to assert it. Here, for example, the only way Morgan could have avoided an inference that he asserted the privilege to protect himself would have been by advising Ms. Scott to waive the privilege – regardless of whether it was in her best interest to do so.

Because Ms. Scott directed Morgan to assert the attorney-client privilege, and because there was no evidence that it was in her best interest to waive it, the Bankruptcy Court erroneously sanctioned Morgan based on an improper inference that he asserted the privilege to protect himself.

### IV. The Bankruptcy Court imposed a greater sanction than necessary to deter future misconduct.

Attorney disciplinary proceedings are "not for the purpose of punishment, but rather seek to determine the fitness of an [attorney] to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice." *In re Echeles*, 430 F.2d 347, 349 (7th Cir. 1970); *see also In re Kunstler*,

914 F.2d 505, 522-24 (4th Cir. 1990) (explaining, in Rule 11 context, "the primary purpose of sanctions is to deter attorney and litigant misconduct"). Where, as here, "there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first." *Nat. Gas Pipeline Co. of Am. v. Energy Gathering*, 86 F.3d 464, 467 (5th Cir. 1996); *see also Shaffer Equip. Co.*, 11 F.3d at 461 ("[The inherent power to sanction] must be exercised with the greatest restraint and caution, and then only to the extent necessary.").

### a. *The Bankruptcy Court failed to consider the necessity of Morgan's revocation.*

The Bankruptcy Court revoked Morgan's privilege to practice without considering whether that sanction was necessary in the first place. It was not. Morgan's revocation was punitive, not preventative, in nature. Rather than sanctioning him to deter future conduct, the Bankruptcy Court sanctioned Morgan as punishment for his prior association with UpRight.

Morgan's revocation was not necessary to deter future misconduct by UpRight and its affiliates. The Bankruptcy Court effectively mitigated that risk by revoking *UpRight's* privilege to file cases, "directly or indirectly," for five years. R169. The UpRight revocation will undoubtedly deter the misconduct giving rise to this proceeding – i.e., unauthorized practice of law, improper fee arrangements, and "scams" like the NCCP. Morgan's revocation, by contrast, was not necessary to prevent those abuses from reoccurring.

28

### b. *The Bankruptcy Court failed to consider lesser sanctions.*

The Bankruptcy Court also failed to consider the availability of lesser sanctions. Instead, based only on Morgan's "past disciplinary record with the Virginia State Bar," the Bankruptcy Court summarily concluded "that a lesser discipline would not be effective." R125. The record does not support that conclusion, particularly as it relates to Morgan's representation of Ms. Scott.

The Bankruptcy Court did not sanction Morgan because he failed to effectively represent Ms. Scott. It sanctioned him because he over-relied on his paralegal during the course of that representation. R123-24. Rather than undertaking to correct Morgan's practices, however, the Bankruptcy Court revoked Morgan's privilege to practice altogether. This was excessive because a lesser sanction, such as a mandatory CLE attendance or a temporary suspension, would have been sufficient.

Morgan's decades-old disciplinary records do not suggest otherwise. For one, the 1992 and 2001 disciplinary proceedings had nothing to do with bankruptcy or the type of conduct at issue before the Bankruptcy Court. Moreover, they do not demonstrate that Morgan has engaged in a pattern of misconduct or, for that matter, any misconduct in the past two decades. Finally, those past disciplinary records illustrate Morgan's willingness to correct past behavior and his determination to remain a contributing member of the bar, as he has been for more than 30 years.

### c. *The Bankruptcy Court failed to tailor an appropriate sanction.*

The Bankruptcy Court failed "to fashion an appropriate sanction that is the most minimal sanction to deter repetition of the practitioner's conduct." *In re T.H.*, 529 B.R. 112, 146 (Bankr. E.D. Va. 2015). It did not tailor Morgan's sanction as a whole – i.e., disgorgement of Morgan's attorney's fees, a $5,000.00 fine, *and* revocation of his privilege to practice – to the facts of this case. This is clear from a comparison of Morgan's sanctions to the lesser sanctions imposed in other cases involving similar conduct.

*In re T.H.*, for example, involved an attorney who filed a bankruptcy petition without his client's authorization, and then failed to produce the original signed petition or adequately communicate with his client throughout the case. 529 B.R. at 141-46. In light of that "especially egregious" attorney misconduct, the court ordered disgorgement of the attorney's fee and suspended his practice privileges for 60 days. *Id*. at 146-47. In doing so, the court found that the "length of suspension [was] consistent with other disciplinary suspensions meted out in the Eastern District of Virginia." *Id*.; *see also In re Parker*, 2014 U.S. Dist. LEXIS 136355 (E.D. Va. Sept. 26, 2014) (affirming bankruptcy court's suspension of attorney for four months); *In re Tran*, 2014 Bankr. LEXIS 4407 (Bankr. E.D. Va. Oct. 17, 2014) (suspending attorney for a period of three months).

Here, by contrast, the Bankruptcy Court made no finding that Morgan's sanctions were "consistent with other disciplinary sanctions meted out" in this district. Nor could it; the Bankruptcy Court improperly attributed UpRight's misconduct to Morgan and, in doing so, failed to tailor an appropriate sanction based on his individual conduct. Accordingly, while Morgan does not appeal his fee disgorgement or $5,000.00 fine, the added penalty of a practice revocation was excessive and should be reversed.

* * * *

The Bankruptcy Court abused its discretion by failing to not only consider the necessity of Morgan's revocation, but also the availability and sufficiency of lesser sanctions. This Court should intervene by vacating, or reducing, Morgan's 18-month practice revocation. *C.f. Ex parte Burr*, 22 U.S. (9 Wheat.) at 531 (declining to intervene where, unlike here, "the complaint [was] not of an absolute removal, but of a suspension, which [was] nearly expired).

## CONCLUSION

The Court should reverse the Judgment of the Bankruptcy Court and render judgment in favor of Morgan. Alternatively, the Court should vacate Morgan's revocation and remand the case for a determination of whether a lesser sanction is appropriate.

Dated: April 12, 2021

/s/ David R. Berry
Monica T. Monday
David R. Berry
GENTRY LOCKE
10 Franklin Rd., S.E., Suite 900
P.O. Box 40013
Roanoke, Virginia 24022-0013
Telephone: (540) 983-9300
Facsimile: (540) 983-9400
monday@gentrylocke.com
berry@gentrylocke.com

*Counsel for Defendants-Appellants,*
*John C. Morgan, Jr., and*
*John Carter Morgan, Jr., PLLC.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) because it contains 7,401 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

/s/ David R. Berry

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 12, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notice of the filing to

the following counsel of record:

Sumi Sakata, Esq.
U.S. Department of Justice
Executive Office of the United States Trustees
441 G. St., NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1399
Fax: (202) 307-2397
Sumi.Sakata@usdoj.gov

W. Joel Charboneau, Esq.
Office of the United States Trustee
210 First Street, S.W., Suite 505
Roanoke, Virginia 24011
Tel: (540) 798-8323
Fax: (540) 857-2844
joel.charboneau@usdoj.gov


/s/ David R. Berry